UNITED STATES of America, Plaintiff,

v.

EXXON CORPORATION, Defendant.

Civ. A. No. 78–1035.

United States District Court,
District of Columbia.

Aug. 6, 1980.

David J. Beck, Ronald D. Secrest, David L. Tolin, Fulbright & Jaworski, Houston, Tex., and Warren Belmar, David R. Johnson, John M. Simpson, Fulbright & Jaworski, Washington, D. C., for plaintiff.

Larry P. Ellsworth, Richard H. Levi, Paul Wallach, Office of Gen. Counsel, Dept. of Energy, Washington, D. C., for defendant.

### MEMORANDUM

FLANNERY, District Judge.

This suit accuses Exxon of 183 million dollars in price overcharges in the sale of crude oil. Massive motions to compel interrogatory answers and document production are presently before the court. The discovery disputes stem from fundamentally

opposing views on the relevance of so-called contemporaneous construction–non–official statements of individual agency employees that interpret or apply the applicable regulations. Upon consideration of the lengthy but articulate briefs submitted by the parties, it is the court's view that the non–official comments of agency personnel are relevant and, accordingly, discoverable.

The first five sections of this Memorandum encompass Exxon's motion to compel. Part I explains the regulatory background of the instant dispute; Part II outlines the parameters of the discovery battle; Part III analyzes the applicable case law interpreting contemporaneous construction, and explicates one particular setting wherein contemporaneous construction is relevant to the merits of a case; Part IV examines the level to which contemporaneous construction discovery extends; it adjudicates those disputes applicable to the instant suit, but concludes the appropriate level depends on the circumstances of each particular case; and Part V addresses privilege questions. The court adjudicates the Department of Energy's (DOE) motion to compel in Part VI of this Memorandum.

## I. BACKGROUND

The relevance and burden issues central to the resolution of this discovery dispute can be best understood upon a brief explanation of the regulatory background.

In the wake of this nation's first serious oil shortage, one of the predecessor agencies of the DOE–the Cost of Living Council (CLC)–issued regulations designed to spur new oil discoveries and to increase domestic oil production. These regulations, issued on August 17, 1973, created two classes of domestically produced crude oil: "old oil" and "new oil."

A crude oil producer may charge a higher price for new oil than for old. Oil companies compute old–new figures by recording a benchmark notation; this figure measures production during the base period of 1972. The benchmark figure is known as a base production control level (BPCL).

The BPCL thus fixes the oil output for oil producing properties for each month during calendar year 1972. If oil production increases in a given month, then the amount produced above the BPCL figure for the corresponding month in 1972 constitutes new oil and, accordingly, commands a higher price. Similarly, if a crude oil producer discovers oil on a previously unproductive site, all oil extracted therefrom qualifies as new oil, since the 1972 BPCL figure is zero.

The CLC regulations required oil companies to determine BPCL's for each piece of "property." The regulations defined property as the "right which arises from a lease or from a fee interest to produce domestic crude petroleum." Hence, each separate lease or fee interest producing domestic crude required the computation in August 1973 of a 1972 BPCL.

An oil company could compute a BPCL in either of two manners. In the first case, the company maintains separate leases, or fee interests, for each adjacent oil producing property. For example, one company may own 10 square miles of land. If it places one well on each square mile, and maintains a separate lease for each of its 10 divisions, then the oil company owns 10 pieces of "property". Accordingly, that company would compute 10 BPCL's.

Alternatively, an oil company may combine the 10 separate leases into one producing "unit." This is known as property unitization. Given such unitization, the 10 separate leases become one unitized property. In this situation, an oil company could aggregate its 10 separate BPCL's into one, unitized, BPCL.

The DOE addressed the latter alternative in Ruling 1975–15. 40 Fed.Reg. 40832 (Sept. 4, 1975). This ruling stated that an oil company must compute a single, aggregated BPCL for a unitized property immediately upon the effective date of the property unitization.

The FEA subsequently amended Ruling 1975–15. The amendment allowed producers the choice of implementing a unitized BPCL either on: 1) the date of property unitization, or 2) the point in time when

production patterns demonstrate a "significant alteration." 41 Fed.Reg. 4931 (Feb. 3, 1976). The significant alteration test became effective on February 1, 1976. The FEA defined "significant alteration in producing patterns" on September 1, 1976. 41 Fed.Reg. 36171 (Aug. 26, 1976), see 10 C.F.R. § 212.75.

The FEA clarified the application of the "significant alteration" definition on January 1, 1977. The clarification stated that units formed before February 1, 1976 were not automatically subjected to the definition. Instead, the definition would constitute a "guidance." Ruling 1977–2, 42 Fed. Reg. 4409, 4415 (1977).

The instant suit concerns a post–1972 property unitization, by Exxon, of its Hawkins Field. Exxon operated the Hawkins Field from September 1, 1973, through December 31, 1976. The field originally was comprised of separate properties. Exxon unitized the properties effective January 1, 1975. But it nonetheless maintained separate BPCL's for the unitized property until September 1, 1976.

The DOE complaint maintains that Exxon, rather than unitizing its BPCL on September 1, 1976, should have instituted unitization on or before June 1, 1975. This is the date that Exxon allegedly engineered a significant change in the Hawkins Field production patterns.

By delaying implementation of a unitized BPCL, Exxon allegedly manipulated its production to qualify a larger percentage of the extracted oil as "new oil." The complaint alleges that, of 27,931,000 barrels of crude pumped during the relevant time pe-

riod, Exxon improperly claimed 22 million barrels as new oil. This allegedly allowed Exxon to reap overcharges of $183,305,-019.79.[1]

## II. DISCOVERY DISPUTES

Exxon claims that the 1973 CLC regulations failed to delineate whether an oil company, upon unitizing its oil producing properties, must also aggregate the attendant BPCL's. It maintains that the DOE position became clarified only on September 1, 1976, the date on which the DOE defined "significant alteration in producing patterns." Exxon therefore believes its decision not to aggregate until that date was fully justified.

Exxon's discovery requests seek to confirm its contention that the proper course of conduct concerning BPCL unitization was unclear. Specifically, Exxon requests "discovery of regulatory and interpretative history of the Department of Energy's 'property' and 'BPCL' definition and contemporaneous construction of statutes, regulations, rulings, regulatory preambles and policies by the agency and by agency personnel—including the question whether and when a base production control level (BPCL) for unitized property must be computed." Exxon Memorandum in support of motion to compel at 15.

The DOE is willing to provide information on the promulgation and interpretation of the terms property and BPCL. The DOE contends, however, that only those agency memoranda and publications that represent official agency policy are dis-

---

1. One example will suffice to explain this scheme. Suppose Exxon has three leases, or oil producing properties, adjacent to each other. In September of 1972 these properties, designated A, B, and C, each produce 10 barrels of oil per day. The BPCL—the benchmark figure to determine old–new oil computed in August, 1973 ·is thus 10 for each piece of property. In September, 1973, after the adoption of the old -new oil concept, Exxon decides to unitize these three adjacent leases into one property. The combined production is 30 barrels per day. A single, aggregated BPCL would also be 30; the combined production in September of

1972. According, Exxon would have no new oil.

Suppose, however, that Exxon decides to shut down the wells on A and B and instead decides to withdraw 30 barrels of oil per day on what was formerly tract C. Suppose further that Exxon retains separate BPCL's for the unitized property. Since the BPCL figure for tract C is 10, and the new production figure is 30, Exxon can claim 20 barrels of new oil and 10 of old. This computation of new oil, and the accompanying receipt of higher prices, occurs without any increase in production or new oil discoveries.

**630**

·coverable under the rubric of contemporaneous construction.[2]

According to the DOE, nonofficial documents should have no bearing on why Exxon waited until September 1, 1976, to implement an aggregated BPCL. Rather, Exxon's actions could only be guided by statements that progressed through agency review, and which the agency adopted as its official policy. The DOE contends these are the only materials from which Exxon, and the court, can construe the intent of the regulations.

Exxon presses a more expansive view of what constitutes relevant contemporaneous construction. It contends the term encompasses agency documents from all employees–of whatever level–that interpret or apply the terms "property" and "BPCL". The opinions of lower level agency officials therefore constitute relevant evidence on whether Exxon properly delayed implementation of a unitized BPCL for the Hawkins Unit.

## III. CONTEMPORANEOUS CONSTRUCTION: WHEN IT APPLIES

The discovery disputes at issue herein rest on whether contemporaneous construction evidence is relevant to the merits of the instant suit. In resolving this question, the court examines first the applicable, though sketchy, case law. The court secondly applies the law to the facts of this case. An application of a synthesis of the case law leads to the conclusion that Exxon is entitled to discover lower level, nonofficial agency statements that interpret and apply the applicable regulations.

### A. The Law

Exxon and the DOE extensively cite case support, and devote large portions of their various briefs to efforts at distinguishing contrary case law. The court will address only those cases relevant to the instant dispute.

Of primary importance is *Standard Oil Co. v. Department of Energy*, 596 F.2d 1029 (T.E.C.A.1978). In *Standard Oil*, the FEA amended its petroleum cost pass through regulations. The amendment instituted a mandatory cost recovery sequence: product costs must first be recovered before the recoupment of nonproduct items.

Although the original regulations were silent on the question of cost recovery sequence, the FEA decided to apply the new sequence determination retrospectively. It justified this action on two grounds. The FEA maintained that: 1) its official interpretations of the original regulations required product cost recovery first; and 2) the entire regulatory scheme, absent a specific delineation, nonetheless allegedly indicated a preference for product cost recovery prior to nonproduct cost recoupment.

The contemporaneous construction question emerges from the former justification. The FEA maintained that it officially interpreted the original regulations to require product cost recovery first. But it also recognized that lower level officials had issued contrary advice. The FEA therefore alleged in *Standard Oil*, as the DOE maintains herein, that lower level opinions should be ignored by the court. *Id.* at 1052.

The court in *Standard Oil* noted the traditional rule of deference to agency interpretation of administrative regulations.[3] *Udall v. Tallman*, 380 U.S. 1; 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616. It nonetheless found the rule of deference inapplicable

2. The DOE suggests that contemporaneous construction is limited to: 1) a regulation's official rulemaking history; and 2) official agency interpretations expressing the agency's collective wisdom on the meaning of a regulation.

The first category includes the preamble of the final regulation, notice of proposed rulemaking, the proposed regulation, and public comments on the proposed regulation. This excludes drafts. The latter category–post promulgation interpretations–includes DOE rulings and interpretations, certain remedial orders, and enforcement and audit manuals. It excludes advice and internal memoranda of individual employees.

3. TECA noted that although agency interpretation normally controls, "[d]eference to an agency's 'interpretation', however, is not a hard and fast rule." 596 F.2d at 1056.

because the FEA interpretation was after the fact, and, because, the original regulations, during the relevant time period, were ambiguous. The TECA thereby found:

> We do conclude, however, that the statements by the FEA auditors and other lower level officials are entitled to weight in determining the thoroughness of the FEA's consideration of its regulations, the validity of its reasoning, and its consistency with earlier and later pronouncements.

*Standard Oil* at 1056.

Exxon seizes upon this statement; it claims that it sanctions the discovery of low level contemporaneous construction materials. The DOE attempts to limit its impact. It argues that, despite dictum that courts may look to statements of lower level officials, the TECA itself, in *Standard Oil*, examined only official agency pronouncements. "At no point did TECA discuss, consider, or even refer to actions of individual auditors or documents which could only be found in operational files of the agency." Plaintiff's Memorandum in opposition to defendant's motion to compel at 30.

The court disagrees. TECA did examine several documents of an official nature. But it also looked to one lower level document, entitled Regulation Change Notice 3–1975–1. 596 F.2d at 1052–53. Three auditors in the FEA's Refinery Audit and Review Program authored the document; it interprets the December 1974 amendments to the petroleum cost pass through pricing regulations. *See Phillips Petroleum Co. v. Department of Energy*, 449 F.Supp. 760, 785 (D.Del.1978), aff'd sub nom., *Standard Oil, supra*. The FEA circulated the document to auditors in the field.[4]

Although it never achieved the level of an official agency interpretation, Regulation Change Notice 3–1975–1 nonetheless does not amount to individual auditor opinion. The Acting Chief of the FEA's Refinery Audit and Review Program directed the preparation of the document. 596 F.2d at

1052. An Assistant General Counsel reviewed the Notice. *Phillips, supra*, at 786–87. Authored by three auditors, it represents a staff explanation of the December 1974 cost pass through pricing regulations. In sum, the Change Notice incorporates some synthesis of thought.

■ The conclusion that this court can discern from *Standard Oil* is consequently amorphous but not without significance. TECA clearly recognized that, in certain circumstances, courts may look to lower level agency interpretations to decipher the agency's own understanding of its regulations. An examination of such lower level contemporaneous construction is appropriate when the agency relies upon an "after the fact interpretation" to enforce, retrospectively, a new regulation that clarifies a situation previously unaddressed by agency directives. *Id.* at 1056. The appropriate level to which discoverable contemporaneous construction extends, however, remains unclear.

Energy cases from Federal District Courts explicate a similar teaching with respect to the specific circumstances necessary for a court's examination of contemporaneous construction materials. They also fail to espouse a hard and fast rule as to the level to which contemporaneous construction extends.

For example, in *Amoco Production Co. v. DOE*, CA No. 78–463 (D.Del. May 29, 1979), various plaintiffs attacked amended DOE rules addressing transfer pricing of liquid natural gas and natural gas liquid products. The FEA promulgated the original regulations in December 1974. These regulations failed to explicate an FEA position on transfer pricing.

The 1978 DOE regulatory amendments prohibited first sale treatment of these products between affiliated entities. The regulations further maintained that this practice had never been permitted. Central to the disposition of the merits of the case,

**4.** The FEA circulated the Change Notice for inclusion in a Compliance Audit Review Division Audit Handbook.

therefore, "is to determine what the law was between January 1, 1975, the effective date of subpart K, and November 1, 1978, the effective date of the 1978 amendments." Opinion, page 4.

Judge Stapleton recognized the necessity of looking to contemporaneous construction; "statements and actions of the agency personnel who have had the responsibility of implementing and enforcing the contested regulatory provisions." *Id.* Citing the technical expertise of agency personnel, and their responsibility to interpret and enforce the regulations, Judge Stapleton ruled:

> [T]he statements and actions of these administrators have been considered significant even in the absence of an approval of their views by the agency, qua agency. Thus, not only opinions and directives in manuals and the like, but also explicit indicators such as the practice of auditors and the reactions of administrators to knowledge of industry practice in applying the regulations have been considered relevant.

*Id.* at 4–5 (citations omitted).[5]

In *Gulf Oil Corp. v. Schlesinger*, 465 F.Supp. 913 (E.D.Pa.1979), as in *Amoco*, a question unaddressed by the original regulations was clarified by a subsequent rule. The plaintiff in *Gulf Oil* challenged, *inter alia*, the validity of FEA Ruling 1977–5. The Ruling interpreted a 1973 CLC definition of the term "transaction." The 1973 regulation defined transaction as a "binding contract", but failed to explicate whether variable price agreements fell within the parameters of the term. *Id.* at 915. The 1977 Ruling, however, interpreted the term binding contract as excluding variable price agreements.

The court noted the lack of any official explanation, in the original regulations, of the terms transaction or binding contract. *Id.* at 916 & n.5. Accordingly, discovery of contemporaneous understandings constituted "the only means by which we may review the challenged Ruling 1977–5 and its relationship to the original CLC regulation." *Id.* at 916. Judge Lord therefore ordered the deposition of certain agency officials who formulated and interpreted the regulations at issue.

Finally, the two District Court opinions, affirmed on appeal in *Standard Oil*, are worthy of attention. *Phillips Petroleum Co. v. DOE*, 449 F.Supp. 760 (D.Del.1978); *Standard Oil Co. v. FEA*, 453 F.Supp. 203 (N.D.Ohio 1978). The Delaware District Court examined Regulation Change Notice 3–1975–1. 449 F.Supp. at 785. It also considered various lower level, nonofficial memoranda. *Id.* at 788–90. The Ohio District Court considered statements of FEA auditors, 453 F.Supp. at 212, and examined a memorandum from two attorneys in the Office of General Counsel. *Id.* at 215.

TECA declined to rule specifically on the relevance of each piece of contemporaneous construction evidence relied upon by the two district courts. But it tacitly approved of the practice. It stated:

> In resolving this issue [of contemporaneous construction] it is first necessary to examine the various interpretations by FEA officials during the relevant period. These are set out in detail in the district courts' opinions. We shall not repeat the findings of the two district courts, except to emphasize a few of the publications and memoranda which are most significant in determining whether this court should defer to the Agency's present interpretation.

---

5. The court in *Amoco* nonetheless refused to allow the discovery of legal analysis underlying DOE interpretations of its regulations. The interpretations, issued by the Office of General Counsel in response to industry requests, did constitute discoverable contemporaneous construction entitled to weight in the adjudication of the merits. But the formulations, or background materials leading to the released interpretation, were not discoverable. The plaintiffs could pursue only the final product. Accord-

ingly, the court denied "discovery seeking to probe the process by which the interpretations were formulated." Opinion, at 8.

Moreover, the court in *Amoco* denied other discovery requests on burden grounds. The court reasoned that in some cases "the discovery requests have gone considerably beyond the point where the likelihood of aid in the interpretive task justifies the burden of the search." *Id.* at 6.

596 F.2d at 1052. One of the documents that TECA considered most significant was Regulation Change Notice 3–1975–1, discussed, *supra.*

B. *Application of the Law to the Instant Cause*

*Standard Oil*, its district court precursors, *Amoco Oil*, and *Gulf Oil*, all involve similar factual settings. In these cases, the original regulations were either unclear or failed to address a particular situation. The DOE subsequently released new regulations, which either clarified the prior ambiguity or delineated a course of conduct not previously addressed.

Litigation arose in these cases when the DOE attempts, or indicates its intention, to enforce the new regulations retrospectively. This necessitates application of the subsequent, clarifying regulations, to a prior time period during which the situation was unaddressed or ambiguous.

The oil companies seek contemporaneous construction materials in their quest to justify their actions. They argue such materials may document that the DOE regulations–before the subsequent clarifications–created a situation of ambiguity. Evidence demonstrating that DOE officials interpreted the regulations in various ways, or even perhaps construed them as sanctioning the industry conduct, advances the industry defendants' defenses.

This is exactly the situation in the instant case. The original CLC regulations, released in 1973, failed to address whether a property unitization must also aggregate its attendant BPCL's. The subsequent regulations, however, required an aggregated BPCL for a unitized property. The DOE now attempts to enforce the subsequent regulations retrospectively. It claims that Exxon should have instituted a unitized BPCL as of June 1, 1975.

Exxon claims, however, that only on September 1, 1976, did it become clear that a unitized property must also establish an aggregated BPCL. On this date the DOE released its definition of significant alteration in producing patterns. Accordingly,

Exxon claims that its failure to unitize until September 1, 1976, was, under the circumstances, fully justified. It argues that the DOE is retrospectively enforcing regulations; the enforcement allegedly applies to a time period during which the original regulations were ambiguous and failed to address the legitimacy of the conduct engaged in by Exxon.

The instant case, along with *Standard Oil, Amoco Oil*, and *Gulf Oil*, teach a uniform lesson. Blinded deference to official agency interpretation is unwarranted when the DOE attempts to enforce, retrospectively, new regulations that clarify a situation unaddressed by the prior regulatory scheme. In this situation, contemporaneous construction is valuable to the court. It enables the court to determine whether those responsible for the enforcement of the original regulations found them ambiguous. And it should also reveal whether DOE employees interpreted the regulations in varying manners, perhaps even as sanctioning the industry conduct.

Of course, the initial regulatory scheme, the administrative record (if one exists), and official agency pronouncements are entitled to great weight. But it would not be proper to adjudicate the legitimacy of industry conduct–unaddressed by the initial regulatory scheme–without also looking to agency employee opinions as to the intent and meaning of the applicable regulations. Accordingly, the court holds that when the DOE enforces, retrospectively, regulations that proscribe industry conduct unaddressed by prior regulations, contemporaneous construction evidence is relevant to the merits of the case, and therefore, is discoverable.

IV. *CONTEMPORANEOUS CONSTRUCTION: LEVEL TO WHICH IT APPLIES*

The court has identified one generic situation when contemporaneous construction materials are discoverable: retrospective enforcement of regulations that clarify the legitimacy of conduct unaddressed by the

634

original regulatory scheme. It remains unclear, however, the extent to which industry defendants [6] should be allowed to search for contemporaneous construction documents.

Examining the organization of the DOE illustrates the various possibilities, available to the court, in determining the contours of relevant contemporaneous construction.

The DOE comprises three levels of organization: the national level; the district or regional level; and the area level. Each of these organization levels may further be divided into numerous strata. For example, at the national level, the Office of Special Counsel may be subdivided into: 1) the Office of the Solicitor, which interprets regulations and provides legal guidance and support; 2) the Office of Management and Industrial Analysis, which manages the Special Counsel's resources and evaluates its programs; 3) the Office of Audit Program Operations, which conducts audits of major oil companies; and 4) the Field Operations Division, which assumes responsibility for the correct implementation of audits in the field.

Contemporaneous construction could, conceivably, apply to all of these levels. Alternatively, a court could exercise its discretion and order discovery applicable to certain office files but not to others.

■ We believe that there is no hard and fast rule to guide a court in resolving the scope of relevant contemporaneous construction. Instead, a court must balance the potential relevance of the desired evidence, along with the likelihood of its existence, against the burden incurred by the agency in culling through its files. With this equation in mind, the court will examine each discovery dispute in turn.

At the national level, the DOE is willing to search the pertinent office files at its national offices.[7] It has also supplied the court with the names of 21 so-called "significant participants." According to the DOE, should the court determine that individual files are relevant, it is willing to search the files of these 21 individuals.

Exxon does not object to the breadth of the DOE search at the national level. It suggests, however, that the DOE's narrow understanding of relevancy necessitates the court to order the search of all potentially relevant documents.

The court has espoused its views on relevant contemporary construction. We are certain the DOE now understands that individual employee interpretations and comments are relevant to the merits of this case.

At the ten Regional Counsel Offices, the DOE is willing to search their subject matter, correspondence, reading, and chronological files. It objects to searching the Regional Counsel case specific law enforcement files on grounds of burden.

■ The court finds these files potentially contain a sufficient amount of relevant information to warrant the burden of searching their contents. According to the DOE, these files contain attorney notes, copies of correspondence, and drafts of the final enforcement documents. The case specific law enforcement files may therefore contain notes or correspondence either disapproving, or approving of, the unitization of a BPCL. Since this is the primary issue herein, the court orders their discovery.

■ The major discovery dispute in this case stems from Exxon's request to search

6. This opinion addresses the applicability of contemporaneous construction when the DOE accuses an industry defendant of wrongdoing. It affirms the use of contemporaneous construction when the DOE retrospectively enforces, against an industry defendant, regulations clarifying a course of conduct unaddressed by the original regulatory scheme. This court intimates no opinion on the applicability of contemporaneous construction to a suit involving an industry plaintiff.

7. These include: 1) the Office of Hearing and Appeals; 2) the Economic Regulatory Administration, which includes the Office of Enforcement, Office of Special Counsel, Office of Regulation and Emergency Planning, and Office of Rules Allocation; and 3) the Office of General Counsel.

the DOE's audit files; specifically, those files compiled by the Office of Special Counsel. The DOE established the Special Counsel's Office to expedite the audit of, and bring appropriate enforcement actions against, the top 34 oil refiners in the United States.

The Crude Producer Audit Division, within the Special Counsel's Office, is responsible for the audit of these 34 companies. The audit addresses the oil companies' compliance with the Energy Department's crude oil pricing regulations. The DOE is prepared to search the files of the Director of Crude Producer Audits. It objects, however, to searching the audit files located at the Division Branches and Site Offices. Exxon is not asking the DOE to search the files of its site offices. The controversy therefore centers on the audit files located at the Crude Producer Audit Division Branch offices.

The Energy Department objects on grounds of burden. It also falls back on its argument concerning official agency statements. According to DOE:

> Files of the branch and site offices consist primarily of files maintained by auditors and support personnel. These individuals are not responsible agency officials whose statements bind the Department.

November 13, 1979 Memorandum at 26.

The court has rejected, *supra*, the DOE argument pursuant to official agency statements. Moreover, the balance of relevance against burden in this situation tilts in favor of Exxon.

Information in the Crude Producer Audit Division Branch office files could be the most relevant available to Exxon. The audit files in the branch division offices contain information on the top 34 crude oil producers. One of these, of course, is Exxon. These files therefore potentially reveal DOE policies toward property unitizations performed by Exxon's competitors. Specifically, the files may reveal DOE employee interpretations of, and attitudes toward, the maintenance of separate BPCL's in audits similar to that performed at the Hawkins Field Unit.

Moreover, Exxon is not asking for a search of the entire file. It only seeks production of the final audit report. If this proves fruitful, then more tailored discovery could follow. The court finds this procedure to be reasonable.

██ The last discovery dispute concerns the time period subject to discovery in the instant case. The discovery of contemporaneous construction materials is appropriate only for the intervening time between the effective date of the original regulatory scheme and the release of the clarifying regulations. In the instant case, the DOE released several clarifying regulations at various times. DOE and Exxon dispute which regulation ultimately clarified the unitization issue; they therefore disagree as to the appropriate discovery cut–off date.

The DOE urges a discovery cut–off date of September 4, 1975. It issued Ruling 1975–15 on that date. This ruling stated that a unitized BPCL must be computed upon the effective date of a property unitization. According to the DOE, Ruling 1975–15 constitutes a definitive and clear resolution of any prior ambiguity. Therefore, discovery subsequent to September 4, 1975 is inappropriate.

Exxon notes that two subsequent amendments to Ruling 1975–15 are endemic to the DOE complaint. The first amendment, effective February 1, 1976, announced that an oil producer must unitize a BPCL either on the date of property unitization, or, alternatively, on the date in which significant alteration in production patterns occur. The second amendment, adopted on September 1, 1976, defined the term significant alteration in production patterns.

These clarifying amendments are relevant, Exxon argues, because the DOE complaint charges Exxon with failing to unitize on June 1, 1975–the date of significant alterations in the Hawkins Field production patterns. Instead, Exxon unitized on September 1, 1976, the date that the DOE defined significant alteration.

The court will adopt a discovery cut–off date of September 1, 1976. The instant

complaint accuses Exxon of failing to compute a unitized BPCL upon the date of significant alteration in production patterns. Since the DOE released its definition of significant alteration on September 1, 1976, contemporaneous construction revealing DOE's understanding of the BPCL issue is relevant up to that date.

Contemporaneous construction regarding Ruling 1977–2, however, is not warranted. This ruling stated that, for property unitizations effectuated prior to February 1, 1976, the significant alteration definition will be considered as guidance, rather than an absolute rule.

Ruling 1977–2 has limited relevance to the merits of this case. The key to the legitimacy of Exxon's actions concerns whether Exxon was reasonable in waiting until September 1, 1976 to unitize the Hawkins Field Unit. Exxon unitized on that date; it clearly believed unitization was necessary as of September 1, 1976. The relevant period of discovery therefore precedes Exxon's implementation of its BPCL unitization. Contemporaneous construction will reveal whether agency officials, prior to that date, were themselves confused as to the necessity of BPCL unitization. Hence, it is only up to September 1, 1976, that Exxon can claim the regulatory pattern was ambiguous on the question of BPCL unitization.

## V. PRIVILEGES

In an August 8, 1979 letter to the court, the parties agreed they presently are not seeking a determination on the applicability of privileges to specifically identified documents. It is nonetheless incumbent upon the court to examine the legal questions regarding privilege. This ruling will notify the parties of appropriate guidelines with respect to which documents, properly subjected to discovery, may be withheld on privilege grounds.

### A. Privilege for Predecisional, Deliberative Memoranda

■ It is clear that the government enjoys a privilege for intra–agency memoranda and documents that record the deliberative, predecisional process leading to an agency decision. This privilege protects the "administrative reasoning process," Kaiser Aluminum and Chemical Corp. v. United States, 157 F.Supp. 939, 946, 141 Ct.Cl. 38 (1958), or those thoughts, ideas, and analyses that encompass the process by which an agency reaches a decision. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 1104, 85 L.Ed. 1429 (1941). Disclosure of predecisional documents would injure the consultative process within the government. Kaiser Aluminum, supra, 157 F.Supp. at 946.

Exxon seeks to overcome this privilege by invoking Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In Overton Park, the Court suggested that when the "bare record may not disclose the factors that were considered or the . . . construction of the evidence," a district court may require administrators to testify and to explain their actions. Id. at 420, 91 S.Ct. at 825.

Overton Park fails to negate the government's claim of deliberative privilege. First, the Court in Overton Park noted that "[o]f course, such inquiry into the mental processes of administrative decisionmakers is usually to be avoided." Id. Second, courts have construed Overton Park narrowly. See Davis, Administrative Law Treatise § 11.00 (1976 Supp.) ("No court of appeals since Overton Park requires the testimony of an administrator about how or why he made a decision"). This Circuit Court of Appeals concurs. It stated that "the mental processes of an administrator may not be probed" unless there is no record of the reasons for an administrative decision. National Courier Ass'n Board v. Governors of Federal Reserve System, 516 F.2d 1229, 1242 (D.C.Cir.1975).

■ Third, Overton Park relies on a factual predicate: the record therein failed to disclose the factors considered by the administrative agency. In this case, to the

extent these factors constitute factual materials,[8] the DOE must excise this information and provide it to Exxon. Evaluations of factors, analyses of factors, and recommendations of factors, however, are privileged; they reveal the decisionmaking process, and, therefore, are protected from disclosure.[9]

Exxon also presents two objections to the form of the DOE's assertion of deliberative privilege. It argues that: 1) the privilege must be asserted by the head of the agency; and 2) the DOE must describe the allegedly privileged documents with specific designations.

 Certainly the privilege must be claimed in the form of an affidavit, rather than a mere assertion in interrogatory or production answers. But we do not believe that the affidavit need be sworn by the head of the agency. Instead, it may be sworn by an official, with delegated authority from the Secretary, to assert such representations.

 As for specific description, the court will order the DOE to prepare an index of privileged documents. This index should mirror the *Vaughn v. Rosen*[10] indices that describe allegedly exempt documents under the Freedom of Information Act. The index should number the documents. Documents that contain segregated portions of factual material should designate which pages and paragraphs are withheld. The index must identify each privilege claimed; if the agency asserts more than one privilege for a particular docu-

ment, it must identify which privilege attaches to each segment. Finally, the index must contain a rudimentary description of each document.

### B. *Attorney–Client Privilege*

Exxon alleges that the DOE has improperly asserted the attorney–client privilege: it contends that the government's factual showings are insufficient.

 This court has recognized the necessity of asserting the attorney–client privilege in a manner specific enough to allow the court to adjudicate the merits of its invocation. *SEC v. Dresser Industries, Inc.*, 453 F.Supp. 573, 576 (D.D.C.1978). A mere assertion of the privilege, without a description of the document tailored to the assertion, is insufficient.

 To ensure the proper invocation of the attorney–client privilege, the court will order, as with the deliberative privilege, the preparation of *Vaughn* –like index. This index should reveal the source of the information, whether the communication occurred in confidence, and whether the source was a lawyer working as an attorney for the DOE.

 Exxon further alleges that some of the information purported to fall within the attorney–client privilege fails to constitute confidential information emanating from a client. This argument engenders a legal principle central to the attorney–client privilege: an attorney–client relation alone is

---

**8.** Predecisional documents fall into two categories: 1) documents that incorporate the deliberative, policy–making process; and 2) memoranda containing factual material. *EPA v. Mink*, 410 U.S. 73, 89, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973). Purely factual material contained in a deliberative memorandum is severable and discoverable. *Id.* at 87–88, 93 S.Ct. at 836. But in some circumstances, "the disclosure of even purely factual material may so expose the deliberative process within an agency" that it may properly be exempted. *Mead Data Cent., Inc. v. U. S. Air Force*, 566 F.2d 242, 256 (D.C.Cir.1977).

**9.** Two of these cases relied upon by Exxon support this court's interpretation of the delib-

erative process privilege. In *Amoco Production Co. v. DOE*, CA No. 78-463 (D.Del. May 29, 1979), Judge Stapleton prohibited the discovery of the process underlying DOE general counsel interpretations of its regulations. *See* Opinion at 7–8. In *Gulf Oil Corp. v. Schlesinger*, CA No. H–79–195 (S.D.Tex. Jan. 29, 1979), the court ruled that the Preamble to a Rule explained sufficiently its intent and meaning; accordingly, it quashed a subpoena seeking the deposition of an administrative official.

**10.** 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 877, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

insufficient to envelop documents under the attorney–client umbrella. "It must also be demonstrated that the information is confidential." *Mead Data Cent., Inc. v. U. S. Dept. of Air Force*, 566 F.2d 242, 253 (D.C. Cir.1977).

The court recognizes the necessity of confidentiality in upholding a claim of attorney–client privilege. The *Vaughn* –type index, which the DOE must file, incorporates this requirement. The DOE, within the index, must identify the source of the communication and whether it emanated with an understanding of confidentiality.

Exxon also alleges that some of the information claimed as exempt under the attorney–client privilege was widely disseminated within the agency. Wide dissemination does indicate a likelihood that the communication was not confidential. *A. O. Smith v. FTC*, 403 F.Supp. 1000, 1019 (D.Del.1976), though it is surely not determinative. The DOE could disseminate a memorandum, to all recipients of the communication, upon an understanding of confidentiality. Accordingly, the court will consider dissemination as one factor in any decision concerning specific documents.

### C. *Work–Product Privilege*

The work–product privilege encompasses the work product rule of *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1974). The rule applies to memoranda prepared "in anticipation of litigation or for trial." This includes "the mental impressions, conclusions, opinions, or legal theories of an attorney." Rule 26(b)(3).

Exxon presents four objections to the government's assertion of work–product. It first argues that work product fails to protect the fact of existence of allegedly privileged documents. For example, Interrogatory 42 asks the DOE to identify documents directing FEA personnel that a lease–by–lease BPCL was permissible for unitized property. Exxon argues that, even if the underlying documents constitute work–product materials, the DOE cannot claim work–product in refusing to at least identify these documents.

The mere identification of documents fails to violate the work–product privilege. As stated by Professor Wright:

> It [the work–product doctrine] does not protect facts learned from the documents or things. There is no shield against discovery, by interrogatories or by deposition, of the facts that the opponent has acquired, or the persons from whom he obtained the facts, or the existence or nonexistence of documents, even though the documents themselves have a qualified immunity from discovery.

C. Wright, *Law of Federal Courts* § 82 at 409 (1976 ed.). Whether the underlying document qualifies as work product is a question for resolution at a later point in these proceedings. The DOE however, cannot invoke work product to shield itself from answering whether such documents exist.

Exxon secondly questions whether the DOE prepared certain items in anticipation of litigation. It again looks to Interrogatory 42, which seeks documents prior to September 1, 1976. The DOE filed the instant lawsuit almost two years later.

It is difficult to determine, in the abstract, whether the DOE prepared, two years prior to filing suit, documents in anticipation of litigation. An agency may anticipate litigation, and consequently generate work product materials, before the filing of a complaint. Wright, *supra*, at 408–09. Even the generic prospect of litigation may be enough. "If the prospect of litigation is identifiable," but nonetheless still a contingency, the work product privilege may apply. *Sylgab Steel & Wire Corp. v. Imoco–Gateway Corp.*, 62 F.R.D. 454, 457 (N.D.Ill.1974); *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 47 F.R.D. 334 (S.D.N.Y.1969).

The court will examine disputed documents *in camera*. If the circumstances reveal preparation in anticipation of the prospect of litigation, then the documents enjoy immunity. The court will order the release of documents, however, that the DOE prepared in its regular course of business; this

includes documents generated, independent of litigation, in the regular dispatch of the DOE's regulatory duties.

Exxon thirdly seeks to invoke the conditional nature of the work product privilege. Trial preparation materials—outside of mental impressions, conclusions, opinions, and legal theories—may be discovered if "the party seeking discovery has substantial need of the materials in the preparation of his case" and the party is unable to obtain the substantial equivalent of the materials without undue hardship. Rule 26(b)(3). Exxon claims that the substantial need and undue hardship criteria attach to certain of its discovery requests. Accordingly, it urges the court to order discovery even if the materials constitute work—product.

Certain materials requested by Exxon do meet the need and hardship standard articulated in Rule 26(b)(3). For example, the final audit report of the Hawkins Field Unit may reveal DOE interpretation on the propriety of unitizing BPCL's. Similarly, DOE employee interpretations of the issue of BPCL unitization vis–a–vis a unitized property are so central to the disposition of the merits of this case as to overcome possible bona fide work product privilege. Any documents addressing this issue bear on the reasonableness of Exxon's decision to defer unitization of the Hawkins Field BPCL's until September 1, 1976.

Finally, Exxon contends that even opinion work product—the mental impressions of an attorney—are not absolutely protected. It alleges that when the opinions are themselves a fundamental issue in the lawsuit, then a court may order their discovery. Exxon contends that in this case "[o]pinion work product would likely embody contemporaneous agency construction of DOE regulations or evaluations of the reasonableness of what Exxon did in the circumstances of this case." Brief at 72.

■ The production of opinion work product, if discoverable at all, is appropriate only when the activities of counsel are directly at issue. [4] *Moore's Federal Practice* ¶ 26.64[4] at 26–447. For example, one of the principal issues in *Handguards, Inc.*

*v. Johnson & Johnson*, 69 F.R.D. 451 (N.D. Cal.1975), concerned whether the defendants had filed a series of patent infringement suits in bad faith. Similarly, in *Panter v. Marshall Field & Co.*, 80 F.R.D. 718, 721 (N.D.Ill.1978), one of the primary defenses asserted was reliance upon the advice of counsel.

■ The activities of counsel are not the primary issue in the instant case. Instead, the primary issue concerns whether Exxon properly delayed aggregation of its BPCL at the Hawkins Unit. DOE employee interpretations of the applicable regulations are relevant in this situation. But absent the direct issue of counsel's actions, this court will protect the opinion work product of the plaintiff DOE.

## VI. *DOE MOTION TO COMPEL*

The government seeks certain documents allegedly necessary to rebut Exxon's affirmative defenses and to decipher Exxon's corporate state of mind. Exxon claims that corporate state of mind is not at issue. It also seeks to restrict the scope of discovery addressing affirmative defenses.

The disputed discovery requests seek: documents between 1973 and 1976 discussing the need to implement a unitized BPCL, as applied to the Hawkins Unit; documents during the same time period discussing the regulatory definition of property and the proper time for establishing a unitized BPCL; economic feasibility studies, authored before January 1, 1975, concerning the possible unitization of properties comprising the Hawkins Unit, and economic studies, prior to September 1, 1976, that discuss lease–by–lease and unit pricing; and documents pertaining to Exxon's affirmative defenses; namely, any documents demonstrating that the FEA interpreted unitized BPCL's as unnecessary for unitized property, documents indicating that the FEA concurred with Exxon's continued use of lease–by–lease BPCL, and documents stating the FEA intended to revise Ruling 1975–15.

The discovery disputes encompass four major arguments: 1) the Howell affidavit; 2) corporate state of mind; 3) privileges; and 4) relevancy. The court finds Exxon's arguments in all areas unconvincing; Exxon will be ordered to produce the disputed materials.

## A. The Howell Affidavit

The DOE filed, as part of its July 7, 1978 opposition to Exxon's motion to transfer this case, an affidavit sworn by Fred C. Howell. Exxon generally objects to answering interrogatories 9–16, parts of document request 1 and all of 2, based on representations made in this affidavit.

The affiant stated that the government already possessed a majority of the material it needed to establish its case. Exxon alleges this court relied on the affidavit in denying transfer; therefore, the DOE cannot justify massive new discovery.

The DOE states that it filed the Howell affidavit before Exxon submitted its answer and the accompanying affirmative defenses. Accordingly, Howell's statement, representing that the government possessed a majority of its evidence, applied only to allegations of the complaint, and not to defenses raised, in the future, in Exxon's answer. Significantly, Interrogatories 9–16 generally seek information pertaining to Exxon's defenses. Moreover, to the extent the DOE seeks information necessary to establish allegations in the complaint, the DOE notes that Howell states a "majority"–not all–of the information necessary to establish the case was in the possession of the government.

Exxon alleges that the Howell affidavit constitutes an admission and therefore no further discovery should be allowed. An admission constitutes a statement that is contrary to a position taken at trial. [4] Weinstein on Evidence ¶ 801(d)(2)(A)[01] at 119 (1978). In other words, an admission must relate to a material fact that either advances or disproves the case.

The Howell affidavit in no way approaches this elementary requirement of an admission. It fails to address an issue that attaches to allegations in DOE's complaint. And it will not be contrary to any position taken at trial. It addresses future discovery requirements; not the merits of the case. See, e. g., Gaspard and Co. v. Govt. of Gaum, 427 F.2d 276, 278 (9th Cir. 1970), quoting Bonebrake v. McCormick, 35 Cal.2d 16, 18–19, 215 P.2d 728 (1950) (an admission constitutes a "declaration by a litigant contrary to his position in the lawsuit"); Employers Mutual Casualty Co. of Des Moines v. Mosqueda, 317 F.2d 609, 612 (5th Cir. 1963) (admission must be "inconsistent with contentions later advanced at trial").

Exxon also argues that the DOE was aware of Exxon's affirmative defenses when it submitted the Howell affidavit. It notes that the instant suit is identical to the administrative action (NOPV complaint) that the DOE withdrew upon filing DOE v. Exxon in federal court. Exxon claims that its answer to the NOPV complaint is similar, and incorporates the same defenses, as those pled in the instant motion. The DOE was in possession of the administrative complaint when it filed the Howell affidavit.

It is true that the DOE did possess Exxon's NOPV answer when it filed the Howell affidavit. But it is unclear whether Mr. Howell intended to include evidence rebutting Exxon's defenses when he stated that documentation compiled by the DOE was "sufficient in scope to cover every aspect of the pending lawsuit."

Three different interpretations of Howell's statement are possible. It could mean the DOE possessed evidence encompassing: 1) every aspect of the allegations propounded in the complaint; 2) every aspect of the suit pending at that time (before Exxon filed its answer); or 3) every aspect of the suit presently pending, and, likely to be raised in Exxon's answer.

Exxon's bold attempt to persuade this court of the third alternative is unpersuasive. It amounts to mere conjecture. Given this ambiguity, the court declines to invoke the Howell affidavit to preclude the DOE from obtaining relevant discovery.

## B. *Corporate State of Mind*

The government states that Exxon's affirmative defenses put its corporate state of mind at issue. This allegedly necessitates discovery into Exxon's corporate files for documents concerning BPCL unitization.

Two affirmative defenses allegedly provide the springboard for delving into Exxon's corporate mind: 1) Exxon's allegation that FEA officials concurred in its failure to aggregate the BPCL's at the Hawkins Unit (reliance); and 2) Exxon's claim that it at all times possessed good faith in attempting to comply with the government's regulations. Exxon's answers to amended complaint, 7th and 11th defenses.

Exxon employs two arguments in attempting to block this discovery. It first argues that reliance and good faith, in the context of this lawsuit, mean that it acted in accord with DOE guidelines. "Accordingly, discovery in this regard must necessarily involve only information which bears upon the exchange between Exxon and DOE, and the context of those communications." Opposition to plaintiff's motion to compel at 13.

█ This is incorrect. Documents reposed in Exxon's corporate files are highly relevant to the merits of its defenses. Whether Exxon properly relied on FEA statements, and whether Exxon acted in good faith, cannot adequately be determined if the court restricts discovery to exchanges between Exxon and the DOE. Statements authored for internal use may well record Exxon's understanding of the FEA directives. Such internal statements should also reveal whether Exxon honestly believed that it acted in good faith. Accordingly, Exxon's corporate state of mind is relevant toward adjudicating the merits of its affirmative defenses.

Exxon secondly argues that industry interpretations of a regulation warrant no weight in deciphering the regulation's intended meaning. This argument is non-responsive. The DOE does not seek corporate state of mind discovery for probative evidence on the correct legal meaning of its regulations. Rather, these materials are necessary to determine the propriety of Exxon's affirmative defenses. Stated otherwise, assuming that this court should afford no weight to Exxon's regulatory interpretations in deciphering the regulation's intent, the industry interpretations nonetheless reveal whether Exxon relied on FEA statements and whether Exxon acted in good faith in failing to unitize its BPCL.

## C. *Privilege: Attorney–Client and Work–Product*

Exxon objects to answering interrogatories 17–19 on grounds of attorney–client and work–product privilege. These interrogatories seek information pertaining to Exxon's claims that the FEA: 1) indicated that an oil company, upon unitizing an oil producing property, need not also unitize its attendant BPCL; 2) assured certain interest owners of the Hawkins Field that Ruling 1975–15 would be revised; and 3) concurred in lease–by–lease BPCL for the Hawkins Unit until September 1, 1976.

Part V of this opinion (privileges) dictates the outcome of several privilege disputes stemming from the DOE's motion to compel. First, the DOE contends that Exxon has refused even to identify documents responsive to interrogatories 17–19. The court recognized, *supra*, that the mere identification of documents is not shielded by claims of privilege. Opinion at 638. Accordingly, Exxon must index those documents responsive to DOE's interrogatory requests.

Second, the DOE claims that Exxon has failed to properly assert its privilege claims. The same requirements that apply to DOE assertions of privilege are also incumbent upon Exxon. Exxon must specify withheld documents in a *Vaughn* –like index. In addition, assertions of the attorney–client privilege must delineate 1) the source of the information, 2) whether the source was, in fact, an attorney, and 3) whether an attorney uttered the information in confidence.

Thirdly, the DOE questions Exxon's assertion of work–product privilege; it believes Exxon may not have prepared certain

items in anticipation of litigation. The court enunciated, *supra,* the standards applicable to DOE's assertion of work–product privilege. Opinion at 638. The same standard applies to Exxon.

■ Resolving the question of opinion work product, however, leads to a different conclusion with respect to Exxon than with the DOE. The court denied the production of DOE's opinion work product because the activities of DOE's counsel were not directly at issue. *See* opinion at 639. Herein, Exxon's claim of good faith puts directly in issue the actions of its counsel in deciding whether and when to unitize. If counsel reflected on the propriety of unitization, then these documents are probative to the merits of the good faith defense. Accordingly, the court orders their production.

### D. *Relevancy*

Exxon charges that documents sought by the government, without specific reference to the Hawkins Unit, are irrelevant to the instant case. Exxon's argument addresses DOE's request for documents that refer to the proper time for, and the propriety of, BPCL unitization. DOE seeks these documents for units outside of the Hawkins Unit for the time period from July 19, 1973 through September 1, 1976.

These requests are highly relevant to the instant case. Exxon's treatment of other unitized properties reflects on the veracity of its good faith claim. In addition, the actions of Exxon at other units, subsequent to its property unitization of the Hawkins Field, may be the most relevant evidence available to the DOE. The uniformity of Exxon's actions reflect on whether it relied on FEA representations and whether, in fact, it acted in good faith.