**KANSAS STATE NETWORK, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

No. 82–1319.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 19, 1983.

Decided Oct. 25, 1983.

William J. Potts, Jr., Washington, D.C., with whom John Wells King, and Lee W. Shubert, Washington, D.C., were on the brief, for petitioner. Michael H. Bader, Washington, D.C., also entered an appearance for petitioner.

Sue Ann Preskill, Atty., Federal Communications Commission, Washington, D.C., with whom Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., David Silberman and Cal P. Saunders, Attys., F.C.C., Barry Grossman and Susan J. Atkinson, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. John E. Ingle, Atty., F.C.C., Washington, D.C., also entered an appearance for respondents.

Before WALD, MIKVA and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

Petitioner Kansas State Network, Inc. ("KSN") seeks review of a decision of the Federal Communications Commission denying KSN's application for a tax certificate under section 1071 of the Internal Revenue Code. We affirm the Commission.

I.

KSN owns and operates television stations in Kansas, Nebraska and Missouri. During the 1960's, petitioner purchased interests in cable television franchises serving six cities in Kansas: 60% ownership interests in Lyons, McPherson, Herington, Norton, and Oberlin, and a 35% interest in Wichita. Each cable system except Herington served a community located within the primary service area of a KSN broadcast station. This cross-ownership of broadcast and cable facilities was permissible when KSN acquired the cable franchises. In 1970, however, the Commission adopted a policy prohibiting common ownership or control of a television broadcast station and a cable television system serving overlapping areas. *Second Report and Order in Docket No. 18397,* 23 F.C.C.2d 816 (1970) (adopting rule 74.1131 codified at 47 C.F.R. § 76.501 (1983)). Because it antedated this policy, KSN's cross-ownership was covered by a "grandfather" exception and so not subject to mandatory divestiture. KSN subsequently acquired several cable systems in the Oklahoma City, Oklahoma, area; these acquisitions did not conflict with the FCC's cross-ownership rules.

On April 1, 1977, KSN exchanged its grandfathered majority interests in the Norton and Oberlin cable systems for the minority interests in the Lyons, Herington and McPherson systems. Subsequently, however, the Commission ruled that acquisition of additional ownership interests in Lyons and McPherson violated section 76.-501 and ordered KSN to divest itself of those interests. *Kansas State Network, Inc.,* 67 F.C.C.2d 737, 741 (1978). KSN then sold its entire Cable Television Division to Multimedia Cablevision, Inc. Through transactions consummated on January 30, 1980 and March 2, 1981, Multimedia purchased all of the Lyons, Herington and McPherson systems, KSN's 35% interest in the Wichita system, and the Oklahoma systems.

Under section 1071 of the Internal Revenue Code, if a sale of property is required by FCC policies, the transaction is entitled to favorable tax treatment; specifically, such sales are treated as involuntary conversions. Section 1071 provides in pertinent part that

(a) *Nonrecognition of gain or loss.*—If the sale or exchange of property (including stock in a corporation) is certified by the Federal Communications Commission to be necessary or appropriate to effectuate a change in a policy of, or the adoption of a new policy by, the Commission with respect to the ownership and control of radio broadcasting stations, such sale or exchange shall, if the taxpayer so elects, be treated as an involuntary conversion of such property within the meaning of section 1033 . . . .

26 U.S.C. § 1071(a) (1976). By petitions filed November 26, 1980 and May 15, 1981, KSN sought tax certificates covering the sale of the Lyons, McPherson, Herington, Wichita and Oklahoma systems. KSN argued that the entire transaction was necessary to the sale of the prohibited interests, stressing the integrated nature of its cable operations and their relatively unattractive character if sold separately.

By the Memorandum Opinion and Order here under review the FCC partially granted and partially denied the petition. *Kansas State Network, Inc.,* 89 F.C.C.2d 392 (1982). Tax certificates were issued for the grandfathered interests in the Lyons, McPherson and Wichita systems and for the Herington system, which the FCC found to be functionally interdependent with Lyons and McPherson. The FCC refused to issue certificates covering the non-grandfathered

interests in Lyons and McPherson as well as in the Oklahoma systems. KSN petitioned for review.

## II.

### A.

The Commission denied tax certificates for the non-grandfathered 40% interests in Lyons and McPherson because it found that the acquisition of those minority positions violated section 76.501 of the FCC's rules. 89 F.C.C.2d at 396. KSN responds that the Commission did not clearly rule on the issue until after the April, 1977 transaction, see *Georgia Cablevision, Inc.*, 65 F.C.C.2d 506 (1977). According to KSN, even though the Commission divestiture order was valid, it would be inequitable to deny tax relief in a case where that order was not foreseeable.

■ We agree with the Commission that it would be unreasonable to read section 1071 as applying to property acquired in violation of Commission policies. The issue, then, is whether equity requires us to treat the 1977 acquisitions as not violative because, as KSN claims, the policy at that time was not clear. This appeal to equity is misplaced. KSN maintains that it cannot fairly be required to have anticipated the rule of *Georgia Cablevision* against additions to grandfathered interests. The Commission stated in that decision, however, that the result it reached was mandated by both a literal reading of section 76.501 and long-standing Commission policy on cross-ownership. 65 F.C.C.2d at 511. KSN advances no argument against this Commission interpretation of its own rules, precedents and policies, and *Georgia Cablevision* appears to involve an innovation of no greater magnitude than any case of first impression. Perhaps *Georgia Cablevision* could have been decided the other way.

That makes no difference. Given the strong policy against cross-ownership, there was ample reason for petitioner to anticipate at least the possibility that the Commission might not approve the acquisition of interests additional to the grandfathered interests in Lyons and McPherson. This is enough to defeat the equitable argument of surprise. That argument is rendered even less persuasive by KSN's failure to avail itself of the declaratory ruling procedure of 47 C.F.R. § 1.2 (1983). Petitioner could have sought clarification before going ahead with the acquisitions. Instead, KSN reported the transaction to the FCC only after it was consummated. KSN is not entitled to a tax certificate for the ungrandfathered minority interests in the Lyons and McPherson systems.

### B.

KSN objects both to the Commission's general policy on tax certificates and to the decision reached under that policy in this case. At the time of KSN's application, the Commission granted tax certificates for sales required by direct Commission order as well as sales mandated by "practical economic necessity" as judged by a prudent businessman. Under the latter standard, if a sale was necessary in order to carry out a Commission order or policy in an economically practical manner, the Commission would issue a tax certificate. *Continental Telephone Corp.*, 51 F.C.C.2d 284, 288 (1975). This is a rational reading of the statutory phrase "necessary or appropriate." [1] We therefore analyze the case, as the FCC did, under the rule of *Continental Telephone*.

Petitioner advances a set of generalized complaints about the Commission's application of section 1071 that may be disposed of quickly. Petitioner asserts that the Com-

1. The Commission has adopted a new policy on tax certificates. That policy is not under attack here and we express no opinion on it. Although KSN claims that their petition was in fact considered under the new, more rigorous standard, we are not persuaded of that. Had the Commission been applying its new standard—that tax certificates should be issued

"only where the sale of property *directly* effectuates Commission policy," Policy Statement on Issuance of Tax Certificates, FCC Public Notice, FCC No. 82–497 (Nov. 10, 1982) at 2 (emphasis in original)—the Commission presumably would not have issued a tax certificate for the sale of the Herington system.

mission abuses its authority by using the statute to make public interest determinations and to formulate tax policy. We see no evidence to support these charges. The criteria enunciated in *Continental Telephone* are merely ways of linking the sale of property to the impact of a Commission policy. That appears to be precisely the task assigned the Commission by section 1071. In an argument that is difficult to follow, petitioner says the tax certificates should have issued because the FCC has no discretion in the matter. Congress having made all policy choices, it is said, the Commission's sole function is to certify a "fact." The suggestion that Congress made all the requisite policy choices through the words "necessary or appropriate," thus leaving the Commission with no discretion, is, to say no worse of it, contrary to reason. What is "necessary" or "appropriate" in particular circumstances is never a "fact" but always a matter of informed judgment. Words conferring discretion in the application of policy could hardly be better chosen.

We turn now to petitioner's contention that it met the criteria applied by the Commission heretofore so that it is entitled to the tax certificates it seeks. The practical economic necessity test is met if a petitioner shows that a separate sale of only the property covered by Commission order would yield a price substantially less than an integrated sale. We think it was reasonable, though not inevitable, for the Commission to conclude that petitioner has not made the showing required by this standard. We turn to a consideration of KSN's evidence.

KSN's Chairman, Charles L. Brown, stated in an affidavit that at the time of sale the Herington, Lyons and McPherson sys-

tems had a nominal market value totalling $2,275,000, Joint Appendix ("J.A.") at 29, while their proportional share of the total sale price was $2,529,444. The figure of $2,275,000 was supported by a letter from Gerry Zimmerman of the independent appraising firm of Daniels & Associates. *Id.* at 85–86. The difference between these figures is said to show that it was more prudent to sell all the systems than to sell only three. Aside from the thinness of the support for the lower figure, the Commission was not required to conclude that any difference in the price for the Kansas systems separately and their price when combined with the Oklahoma systems requires the issuance of a tax certificate.[2]

Noticeably lacking from KSN's submissions was evidence of any substantial attempt to test the market. At oral argument counsel for the Commission suggested that the *Continental Telephone* showing could be made either with an outside appraisal that addressed the relevant issues or with a demonstration that actual market offers for separate sales fell substantially below offers for the integrated system. KSN suggested that its foray into the market for separate buyers had been unsuccessful, but unlike the petitioners in *Continental Telephone,* it made no actual showing that it had "sought and received offers for less than all of its systems." 51 F.C.C.2d at 285. The affidavit submitted by KSN says only that, "[w]ith regard to the 1979 divestiture, KSN had contacted an individual it knew might be interested in the system. That contact did not materialize into an offer." Affidavit of Charles L. Brown, J.A. at 28. This description of petitioner's only test of the market before selling to Multimedia is so vague and guarded that it has

---

**2.** Furthermore, there are other possible explanations for Multimedia's willingness to pay over $200,000 more than the appraised "nominal market value" for the three Kansas State Network cable systems when combined with the Oklahoma system. For one, it appears possible that the Oklahoma systems are particularly attractive, *see* 89 F.C.C.2d at 397 (Oklahoma systems have high subscriber potential), so that a presubscriber division of the total actual sales price would underestimate the contribution

from Oklahoma and overestimate the contribution from Kansas. It is also possible that Multimedia was willing to pay a premium in order to enter a new market. If so, the Commission would have been justified in finding that the desire for that bonus was not equivalent to a practical economic necessity. Had petitioner provided more information and analysis, these matters might have been clarified. As matters stand, we cannot say that the Commission erred in its judgment.

no weight as evidence. Otherwise, KSN offers only the affidavit of Wilson Wearn, president of Multimedia in which he states that "Multimedia did not have an interest in purchasing only those [Kansas] portions of the KSN Cable Division." Affidavit of Wilson Wearn, J.A. at 37. Multimedia's statement that it was not interested in separate purchases does not conclude the issue. Even if we take this highly general and conclusory affidavit at face value, it does not follow that what was necessary in Multimedia's judgment to meet its "goals for entry into the cable industry in a substantial and economically viable manner," *id.,* is the same as what other possible purchasers would have decided, had they been approached.

The outside appraisal submitted by KSN, in the Commission's judgment, fell short of the showing made in *Continental Telephone.* There, the consulting firm's report gave extensive information to support the firm's conclusion that

> given the high degree of integration within the Continental CATV operations, the systems required to be divested could not ... have been sold at a fair price except as a part of a package which included the remaining systems. Splitting the systems would have rendered the remaining systems uneconomic and substantially reduced their sale price.... [F]urther[,] ... Continental could have had no reasonable expectation of consummating a sale of either of the two groups independent of each another.

51 F.C.C.2d at 286. One of the facts supporting the consulting firm's conclusion was Continental's "high percentage of small systems in rural communities which led it to the concept of using divisional offices to serve a group of systems and centralized maintenance and administrative functions to achieve operational economies." *Id.* KSN also claims a high degree of integration resulting in cost-savings, but the Commission found that there was neither physical proximity nor technical connection between the Kansas and Oklahoma systems; rather, there was no more connection than between any two systems having common

ownership and corporate management. In the Commission's judgment, KSN's demonstration of generalized savings from centralized management did not amount to a showing of integration to an extent compelling sale as a unit. This seems an allowable conclusion since a contrary conclusion would mean that the efficiencies of centralized management always makes "necessary or appropriate" the sale of all systems rather than only those whose ownership offends the Commission's policy. Neither the statute nor the Commission's prior decisions compels that result.

■ It is not our task to undertake a de novo review of the Commission's decision. We may inquire only whether the Commission's decision was rational, within the scope of its authority, and evinces a consideration of the "relevant factors." *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Although the Commission has recognized that a high level of functional and operational interdependency between systems makes a prima facie case that separate sale would be economically unsound, *Continental Telephone,* 51 F.C. C.2d at 288 (general economic necessity test includes "single operational entity" test); *see King Video Cable Co.,* 49 F.C.C.2d 1297, 1298–99 (1974) (sale of unaffected properties necessary or appropriate when part of single operational entity); *Cosmos Cablevision Corp.,* 33 F.C.C.2d 293, 295 (1972) (same), the Commission did not believe that KSN had made such a case. On these facts, we are not prepared to override the Commission's judgment.

At oral argument, counsel for the FCC conceded that the criteria for the issuance of a tax certificate are not clearly laid out and must be deduced from the pattern of prior Commission decisions. KSN may, therefore, have believed that its showing was adequate. This does not mean that either we or the Commission must, for that

reason, accept the showing as adequate. This is not a case in which a company was trapped by unclear decisional law into an irrevocable course of action. If it had anything further to offer, KSN could have amended and supplemented its showing in a request for reconsideration, as did the petitioners in both *Continental Telephone* and *Georgia Cablevision Corp. & Atlanta Home Theatre*, 83 F.C.C.2d 326 (1980), *petition for partial reconsideration granted*, FCC No. 83–225 (May 26, 1983). In both of those cases the petitions for reconsideration were successful. Instead, KSN chose to seek immediate judicial review. That was its right, of course, but the choice removes the question of surprise from the case and leaves us to judge only whether the FCC's decision was a reasonable one. By seeking judicial review rather than Commission reconsideration, KSN indicates a dissatisfaction more with the Commission's general policy than with its special determination of the factual questions posed by this case. We find the Commission's policies unobjectionable and its determination here supportable.

### III.

To support its contention that it is the victim of an unfair Commission policy, petitioner submitted, as part of the Joint Appendix, a transcript it had made of an open meeting of the Commission held on February 11, 1982 pursuant to the Sunshine Act's requirement of public deliberations. KSN's petitions for tax certificates were discussed at that meeting. Respondent has moved to strike the transcript, arguing that it is not part of the record on review. The parties have briefed this issue.

Under section 2112(b) of title 28 (1976),

The record to be filed in the court of appeals in such a proceeding [to review an agency's orders] shall consist of the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence and

proceedings before the agency, board, commission, or officer concerned, or such portions thereof. . . .

Rule 16(a) of the Federal Rules of Appellate Procedure, set out in the margin, contains virtually identical language.[3]

■ We grant the motion to strike. Where an agency has issued a formal opinion or a written statement of its reasons for acting, transcripts of agency deliberations at Sunshine Act meetings should not routinely be used to impeach that written opinion.

■ The "predecisional process leading to an agency decision," *United States v. Exxon Corp.*, 87 F.R.D. 624, 636 (D.D.C. 1980), is worthy of protection where a formal opinion is issued. In order to protect "those thoughts, ideas and analyses that encompass the process by which an agency reaches a decision," as well as the entire "administrative reasoning process," intra-agency memoranda and documents recording the deliberative process leading to an agency decision are privileged from discovery. *Id., citing Kaiser Aluminum & Chemical Corp. v. United States*, 157 F.Supp. 939, 943, 141 Ct.Cl. 38 (1958), and *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). This rationale is equally compelling here, where petitioner is asking this court to permit examination of the agency's actual deliberations, despite the agency's having issued a formal opinion. Just as disclosure of predecisional documents would "injure the consultative process within the government," 87 F.R.D. at 636, so too would judicial review of the agency's deliberations in this case. In general, an agency's action should be reviewed based upon what it accomplishes and the agency's stated justifications.

This case is unlike *Pan American World Airways, Inc. v. CAB*, 684 F.2d 31 (D.C.Cir.

---

**3.** Rule 16. The Record on Review or Enforcement

    (a) *Composition of the Record.* The order sought to be reviewed or enforced, the findings or report on which it is based, and the pleadings, evidence and proceedings before the agency shall constitute the record on review in proceedings to review or enforce the order of an agency.

1982), where the Board failed to comply with the Sunshine Act and did not write a contemporaneous statement of reasons. In that case, review of the transcript was necessary to dispose of the issue of whether the agency had complied with the Sunshine Act. Moreover, given the lack of a written decision, the court could not assess the "reasonableness" of the Board's action without examining the transcript. No such necessity exists here because the agency's rationale has been clearly articulated.

The Commission's Motion to Strike is granted. The Commission's decision is

*Affirmed.*