**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**GULF & WESTERN INDUSTRIES, INC., Charles G. Bluhdorn, Don F. Gaston, Defendants.**

**Civ. A. No. 79–3201.**

United States District Court, District of Columbia.

July 23, 1981.

junctive relief is sought.

A. Fred Freedman, Irving M. Einhorn, Asst. Chief Trial Attys. and Steven Rosenberg, Charles Lerner, Joseph Carney, Janet Weiss, Enforcement Division, Securities and Exchange Commission, Washington, D. C., for plaintiff.

Arthur L. Liman, Max Gitter, Moses Silverman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Gulf & Western Industries, Inc.

Edward Bennett Williams, Jerry L. Shulman, Williams & Connolly, Washington, D. C., for defendant Charles G. Bluhdorn.

Peter E. Fleming, Jr., John E. Sprizzo, Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant Don F. Gaston.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This opinion is concerned with troublesome and important questions relating to a long-recognized and established doctrine, the attorney-client privilege.

The questions arise from charges that the Securities & Exchange Commission (Commission or SEC) deliberately set upon and breached the privilege during the course of a three-year investigation of the financial affairs of Gulf & Western Industries, Inc. (Gulf & Western). The investigation was followed by a civil complaint filed against that company and two of its top corporate officials, Charles Bluhdorn and Don Gaston. The three defendants were charged in a 60-page complaint[1] with a wide range of violations of federal securities laws, including false and misleading financial reporting and disclosures to the Commission and to shareholders, and various other fraudulent courses of conduct.[2]

In response to the complaint, the propriety of the Commission's investigation was initially challenged by the assertion of several affirmative defenses. Earlier in the proceeding, a Commission motion to strike certain of the defenses was granted. However, the Court deferred a final decision on an affirmative defense alleging two gross improprieties during the agency investigation,[3] and allowed the defendants to pursue discovery in the challenged areas. Following discovery the defendants also filed a motion to dismiss the complaint.

The claimed improprieties were (1) that the Commission solicited and extracted confidential and privileged information from Joel Dolkart, Gulf & Western's outside general counsel, and (2) that the Commission

---

1. The original complaint, filed on November 26, 1979, was superceded by an amended complaint which added a seventh claim covering an allegedly misleading filing with the SEC in September 1980. In all other respects, the complaints are identical. Future references to the "complaint" will be to the amended complaint filed December 3, 1980.

2. The defendants are charged with numerous securities violations from 1968 through 1975 under the following statutory provisions: § 17(a) of the Securities Act of 1933; §§ 10(b), 13(a), 13(d) and 14(a) of the Securities Exchange Act of 1934, and various rules, including Rule 10b–5.

3. *See SEC v. Gulf & Western, Inc.*, 502 F.Supp. 343 (D.D.C.1980).

deliberately leaked information about its investigation to the press—the *New York Times*—and aired the matter in the public media, thus punishing the defendants and stripping them of their due process rights.

The Court has considered the additional legal memoranda of counsel, their oral arguments, the relevant portions of the deposition testimony, and the entire record. The defendants have not sustained their burden. The asserted affirmative defense is lacking in support, both factually and legally. Accordingly, the Commission's renewed motion to strike the affirmative defense is granted and the Gulf & Western motion to dismiss the complaint is denied.

## I.

## BACKGROUND

### A.

Joel Dolkart served as outside general counsel to Gulf & Western for sixteen years. During the time relevant to this proceeding, he also wore several other hats, serving as a Gulf & Western corporate director, secretary and a member of its pension advisory committee. As a partner in the New York-based law firm of Simpson Thacher & Bartlett, his attention and time were devoted primarily to Gulf & Western affairs.

In 1974 Simpson Thacher commenced an investigation of suspicious and questionable withdrawals by Dolkart from the law firm's financial account. Subsequently, he was accused of siphoning off for his own use more than 2.5 million dollars of fees paid by Gulf & Western to his law firm and a further half million dollars from the corporation. The embezzlements were immediately reported to the district attorney for New York County, New York. In late 1974, a New York County grand jury charged Dolkart in an 89-count indictment with multiple counts of grand larceny, criminal possession of a forged instrument, forgery, falsifying business records, and state income tax fraud.

Dolkart's counsel filed a series of pretrial motions including a motion to dismiss. When that motion was denied, his counsel then engaged in plea agreement discussions with the district attorney. According to the New York County district attorney:

> Dolkart claimed to have concrete information about serious misconduct committed by officers of prominent corporations. Since most of the alleged misconduct fell within the jurisdiction of the United States Securities and Exchange Commission, the District Attorney's Office contacted the S.E.C. and learned that there was intense interest in obtaining information about Dolkart. Because of this interest, and also because of the District Attorney's own realistic appreciation that investigations into corporate crime can rarely be successful without information from insiders like Dolkart, the District Attorney did enter into discussions with Dolkart's counsel.[4]

A written plea agreement provided that Dolkart would cooperate with the county prosecutors and the Securities & Exchange Commission on subjects and matters about which he had knowledge or information.[5] If he fully cooperated, the prosecutor would recommend that his sentence be reduced to a term of probation without any incarceration. After pleading guilty to one count of the indictment, Dolkart was provisionally sentenced to an indeterminate sentence with a maximum of three years incarceration. Execution of sentence was stayed to allow his cooperation.

During the period June 1976 to June 1977, Dolkart talked with SEC staff members about various Gulf & Western transactions and affairs. Staff notes indicated that SEC personnel met with Dolkart for approximately eleven days over that period. Before the scheduled resentencing, the Commission submitted a letter explaining Dolkart's cooperation and an affidavit from Dolkart setting forth matters covering al-

---

4. Defendants' Exhibit (Defs.Ex.) 142.

5. Defs.Ex. 2, App. B.

leged improper corporate transactions.[6] At the resentencing, the trial court refused to modify the sentence claiming that to do so was not in the public interest.

The sentence was appealed; the case was reversed and remanded with instructions to reduce the sentence to a term of probation. The appeals court held that the trial judge abused his discretion by not adequately considering Dolkart's extensive cooperation with the authorities or the fact that he had accomplished restitution of the stolen money. On remand, Dolkart was given a five-year term of probation by a different trial judge. The Commission did not take a position on his sentencing at either stage of the court proceedings.

The defendants claim that the Commission "pursued" Dolkart and affirmatively induced him to breach the attorney-client privilege, thus obtaining an insider's view of Gulf & Western that only its principal lawyer could provide. The plaintiff argues that Dolkart cooperated in accordance with a judicially-approved agreement and that the Commission's staff, Dolkart and his attorney were ever-sensitive to and complied with the requirements of the attorney-client privilege.

### B.

On July 24, 25 and 26, 1977, the *New York Times* ran a three-part series on the alleged violations committed by Gulf & Western. The articles, authored by investigative reporters Seymour Hersh and Jeff Gerth, contained detailed information about the Commission's "confidential" investigation of Gulf & Western and reported information that Dolkart had secretly provided to that agency. The sources of the information were identified as Gulf & Western officials and government sources. Although the Commission had been investigating Gulf & Western for 18 months when the articles were published, the investigation was classified "non-public" and was to be kept confidential until the complaint was filed.

When the SEC staff was informed that news articles would appear attributing information to "government officials" and "government sources", they requested that the reporters provide specific disclaimers in the articles explaining that the information was not obtained from the Commission. Commission members claim that the reporters represented to them that the sources were not within the SEC. However, no disclaimer statement was published.

During their depositions, the Commission staff members denied leaking information to the press. Several did admit having various conversations and meetings with the two reporters. The staff members insisted, however, that they received information from the reporters and never gave any "non-public" information in return. In fact, the Commission maintains that the staff had a responsibility, and was instructed, to learn what they could from members of the press. After the articles appeared, Gulf & Western's counsel wrote to the Commission protesting the apparent leaks. The Commission replied and called the accusations unfounded. Defendants claimed that the SEC staff leaked the stories to the press as an attempt to summarily penalize the company and that such actions were prejudicial to their rights. The Commission's staff denied conveying information to the press and contended that Gulf & Western officials and other government officials were the reporters' sources.

## II.

## ANALYSIS

### A. *The Attorney-Client Privilege*

In discussing the undermining of the attorney-client relationship, the joint memorandum of the defendants included a subsection, "Averting One's Eyes from the Obvious" which refers to a series of incidents, allegedly open and notorious breaches.[7] At oral argument, their counsel focused upon

---

**6.** Defs.Ex. 5.

**7.** Defendants' Joint Memorandum of Points and Authorities, April 24, 1981, at 57.

each. Before proceeding to consider and analyze those instances and other challenges, the underlying policies supporting the privilege should be noted as they apply to the problems here presented.

1.

The attorney-client privilege protects the oldest of the confidential relationships. While originating as a way to protect an attorney's honor by not forcing disclosure of a client's secrets, it has since developed into a means to encourage a client's confidence and trust in his legal advisor by eliminating his fear of disclosure. 8 Wigmore, *Evidence* § 2290 at 543 (McNaughton Rev. 1961). Federal Rule of Evidence 501 provides that the privilege is to be "interpreted by the courts of the United States in light of reason and experience."

Over the years, courts have redefined and enlarged the underlying policy of the privilege, accommodating it to the factual situations that arise in individual cases. In 1888, the Supreme Court explained that the privilege was "founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888). The Supreme Court's most recent analysis was advanced in *Upjohn v. United States*, 449 U.S. 383, 101 S.Ct. ·677, 682, 66 L.Ed.2d 584 (1981). Justice Rehnquist explained the privilege:

> Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client.

Although the privilege is generally accepted as sacred, it has been often criticized and arguments have been advanced to narrow and constrict its limits. Wigmore has cautioned:

> Its benefits are all indirect and speculative; its obstruction is plain and concrete .... It is worth preserving for the sake of general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.

Wigmore, *supra*, § 2291 at 554.

In a class action brought by shareholders against a corporation and officers based on alleged securities law violations, a Fifth Circuit panel noted that to place the privilege in proper perspective, it must be remembered "that the public has the right to every man's evidence, and exemptions from the general duty to give testimony that one is capable of giving are distinctly exceptional." *Garner v. Wolfinbarger*, 430 F.2d 1093, 1100 (5th Cir.), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1970), *on remand*, 56 F.R.D. 499 (S.D.Ala. 1971). It is, of course, recognized that the privilege cannot be claimed as to communications involving prospective commissions of criminal or fraudulent activities. *See United States v. Bartlett*, 449 F.2d 700 (8th Cir.), *cert. denied*, 405 U.S. 932, 92 S.Ct. 990, 30 L.Ed.2d 808 (1972).

Applying the privilege to concrete factual situations is difficult when an individual is the client; it is even more so when a corporation is the client.[8] The fact that .the privilege is applicable to corporations was settled in *United States v. Louisville & Nashville R. Co.*, 236 U.S. 318, 336, 35 S.Ct. 363, 369, 59 L.Ed. 598 (1915). However, problems developed as courts attempted to define which corporate employees should be

---

**8.** *See, generally,* Burke, "The Duty of Confidentiality and Disclosing Corporate Misconduct", 36 Bus.Lawyer 239 (1981); Perlman, "The Attorney-Client Privilege: A Look at Its Effect on the Corporate Client and the Corporate Executive", 55 Ind.L.J. 407 (1980); Tankersley, "The Corporation Attorney-Client Privilege; Culpable Employees, Attorney Ethics, and the Joint Defense Doctrine", 58 Tex.L.Rev. 809 (1980); "Attorney-Client Privilege for Corporate Clients: The Control Group Test", 84 Harv.L. Rev. 424 (1970).

embraced in the term "client." [9] The test most often cited to determine when communications between an employee of a corporation and the attorney become privileged was developed by Judge Wyzanski in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950):

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort, and (4) the privilege has been (a) claimed and (b) not waived by the client.

■ Although the tests differ slightly, several elements surface. First, the communication must originate in confidence and not be disseminated beyond those persons who need to know its contents. *Brinton v. Department of State*, 636 F.2d 600, 603 (D.C.Cir.1980); *Mead Data Central, Inc. v. United States Department of the Air Force*, 566 F.2d 242, 254 (D.C.Cir.1977). Second, the communication must be with an attorney for the express purpose of securing legal advice. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). *United States v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981). Business and personal advice are not covered by the privilege. *Id.* at 1044. These two principles form the crux of the justification for the privilege and allow courts to apply the privilege on a case-by-case basis. *Upjohn v. United States*, did not articulate or provide more specific guidelines regarding corporations and the privilege as some had anticipated.[10] The Supreme Court noted at 101 S.Ct. at 686:

> Needless to say, we decide only the case before us, and do not take undertake to draft a set of rules which should govern challenges to investigatory subpoenas. Any such approach would violate the spirit of F.R.E. 501 . . . While such a "case-by-case" basis may to some slight extent undermine desirable certainty in the boundaries of the attorney-client privilege, it obeys the spirit of the Rules.

■ In analyzing the present factual situation and focusing on policies underlying the privilege at the same time, two forces compete. First, the relationship between the attorney and the corporate client must be fostered by protecting legal communications intended to be confidential. On the other hand, a corporate client should not be allowed to conceal a fact by disclosing it to

---

9. The circuit courts struggled with the problem and became divided as to how to decide when the "corporation" was seeking advice. Two tests surfaced. The "control group test" requires "that the communicant be in a position to control or take a substantial part in a decision about any action to be taken upon the advice of the lawyer, or that the communicant be a member of a group having such authority." *Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co.*, 68 F.R.D. 397, 400 (E.D.Va.1975). *Accord, In Re Grand Jury Investigation*, 599 F.2d 1224 (3rd Cir. 1979). The "subject matter test" provides that "an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's lawyer is privileged where the employee made the communication at the direction of his superiors where the subject matter upon which the lawyer's advice was sought by the corporation and dealt with in the communication was within the performance by the employee of the duties of his employment." *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1978) (en banc); *Accord Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487 (7th Cir. 1970), *aff'd mem. by an equally divided court*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). In *Upjohn*, the Supreme Court indicated it preferred a modified subject matter test. This issue is not involved in the present proceeding because there is no question that the officers had the authority to direct the legal affairs of the corporation.

10. Chief Justice Burger argued in his concurrence that the Court "should articulate a standard that will govern similar cases and afford guidance to corporations, counsel advising them, and federal courts." 101 S.Ct. at 689.

the corporate attorney. The Fifth Circuit has referred to this as the "balancing of interests between injury resulting from disclosure and the benefit gained in the correct disposal of litigation." *Garner v. Wolfinbarger*, 430 F.2d at 1101.

■ At the outset, it is recognized that the burden is on the party claiming the privilege to show that the consultation was professional and confidential.

> The privilege for communications of a client with his lawyer hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice .... The burden of proof ... rests on the person asserting the privilege to show that the consultation was a professional one.

*McCormick on Evidence*, § 88 at 179 (2d Ed. 1972). And with respect to the confidentiality requirement:

> It is the essence of the privilege that it is limited to those communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as so intended .... A mere showing that the communication was from client to attorney does not suffice, but the circumstances indicating the intention of secrecy must appear.

*Id.* § 91 at 187–88. As to the burden of proof, this Circuit Court noted in *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854 (D.C.Cir.1980) that "[t]he burden is on the [claimant of the privilege] to demonstrate that confidentiality was expected in the handling of these communications, and that it was reasonably careful to keep this confidential information protected from general disclosure."

A blanket assertion of privilege is unacceptable. The proponent must conclusively prove each element of the privilege. The Seventh Circuit explained this requirement in *FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir. 1980):

> This court ... [has] specifically disapproved blanket assertions of attorney-client privilege .... The burden is on

the party claiming the privilege to present the underlying facts demonstrating the existence of the privilege .... This is not to say that the party must detail the contents of each communication, for that would indeed violate the privilege. But the party must supply the court with sufficient information from which it could reasonably conclude that the communication: (1) concerned the seeking of legal advice: (2) was between a client and an attorney acting in his professional capacity; (3) was related to legal matters; and (4) is at the client's instance permanently protected. (citations omitted).

### 2.

■ The alleged obvious and notorious breaches of the attorney-client privilege referred to, were culled in large part from the SEC staff notes generated during Dolkart's interrogation. Gulf & Western contends that on those occasions he divulged to the Commission either his own legal advice or the advice of Simpson Thacher covering nine specific areas: (1) advice about the Pension Fund; (2) Bluhdorn's purchase of Bangor Punta securities; (3) insertion of a litigation-out clause in certain tender offer documents; (4) a fraudulent filing of a Schedule 13D with the Commission relative to Gulf & Western's intent to make a tender offer; (5) the application of Rule 10b–6, Securities Exchange Act of 1934, to certain transactions involving Gulf & Western's securities; (6) a legal opinion on whether there had been compliance with the antitrust laws involving the Amfac corporation; (7) Schedule 13D filings and antitrust considerations on a proposed tender offer and the likelihood of litigation on that issue; (8) discussions during the deposition of a senior corporate officer involved in private tender offer litigation—the "advice" regarded perjured testimony and destruction of relevant documents; (9) a disclosure question requiring "a lot of research". Several of these instances relate to the defendants' plan to acquire through a tender offer, an interest in the Great Atlantic & Pacific Tea Company (A&P).

As to these allegations, the defendants' arguments are overstated. They have not clearly shown, as they are required to show, that this alleged "advice" was given by Dolkart or Simpson Thacher in a professional legal capacity. In several instances, Dolkart arguably received information in his role as director of Gulf & Western or in his various other roles. For example, he was a member of the Pension Fund's investment committee and did not serve as its counsel. Any information he obtained at meetings or advice he gave in this capacity would not be privileged. His undisputed testimony shows that he was concerned about the litigation-out clause, the fraudulent 13D disclosure and antitrust considerations on the A&P tender offer because of his duties as director of the company and his views were voiced in that role. A different law firm, Vinson & Elkins, represented Gulf & Western in the A&P tender offer. During that transaction, Simpson Thacher was not giving legal advice but only acting as a "scrivener". "[W]here the communication is to the attorney acting as a mere scrivener . . . the consultation is not professional nor the statement privileged." McCormick, *supra*, § 88 at 180. Also, business advice, such as Dolkart gave to Bluhdorn on the disadvantages of purchasing Bangor Punta securities, was clearly not privileged. *See United States v. Exxon Corp.*, 87 F.R.D. 624, 638 (D.D.C.1980). Finally, the "advice" given during Bluhdorn's preparation for his deposition, was really a suggestion by his executive assistant that he not correct his perjured testimony, and that certain revealing documents be destroyed. No evidence was presented as to the capacity in which Dolkart was serving during that deposition or why he was involved in these discussions.

In short, as to the several instances, defendants have failed to prove the minimum requirement, that the alleged advice was given in a professional legal relationship. Because of Dolkart's many roles and the large amount of time he spent at Gulf & Western's offices, it cannot be assumed that all of his discussions with corporate officials involved legal advice.

Nor was evidence presented that the advice in question was confidential at the time it was given or that confidentiality has since been maintained. The Commission contends that the advice about the purchase of Bangor Punta securities was given by a number of people and widely disseminated. Also, the discussions regarding the litigation terms in the tender offer documents, the fraudulent schedule 13D and the antitrust considerations on the proposed A&P tender offer, allegedly took place in the presence of a third party. This Circuit recently stated "that . . . *the mere showing of voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege . . . .* (emphasis in original). *United States v. American Tel. and Tel. Co.*, 642 F.2d 1285, 1299 (D.C.Cir. 1980). Moreover, some of the challenged information was revealed in publicly filed documents. The application of Rule 10b–6 to certain transactions, was discussed in a no-action letter from Simpson Thacher to the Commission which explained that Gulf & Western had purchased numerous shares of its own common stock and described proposed future acquisitions. Information concerning the A&P tender offer was intended by Dolkart to be disclosed in public documents. Communications revealed to unessential third parties or contained in public documents are not even colorably privileged. Defendants did not bear their burden and show that the information was confidential. Their burden may not be shifted to the SEC merely because the staff notes are unclear.

Finally, defendants claim that pinpointing the specific instances buttresses their argument that the entire complaint originated in breaches of the privilege. Five of the nine, however, relate to Gulf & Western's interest in the A&P. That transaction is not set forth nor is it mentioned in the Commission's complaint. The same holds true for the second cited instance which refers to Dolkart's advice on the disadvantages of investing in Bangor Punta securities and the alleged antitrust advice involving the Amfac corporation. No allegation in the complaint relates to these transac-

tions. Of the several mentioned, only one, the Pension Fund, is contained as an allegation in the complaint.[11]

The Court focuses on these nine instances, not to prove that the Commission's view of the facts is correct, but to emphasize that the defendants have failed to prove each element of the privilege. Since the defendants pointed to these nine, it is inferred that they are the most egregious examples.

### 3.

▪ Over and above the nine targeted instances, the defendants focused on other aspects of the investigation which they claim violated and subverted their rights. They charge that the Commission completely ignored and disregarded the privilege, affirmatively prevented defendants from protecting their rights and deliberately avoided making a record of discussions with Dolkart.

The first argument overlooks and brushes aside several aspects of the record. There was testimony from staff directors, Stanley Sporkin and Theodore Levine, that it was made clear to Dolkart's attorney that they wanted to steer clear of privileged material and communications and that they would rely, in the first instance, on Dolkart and his attorney to assure that such information was not disclosed.

Further, when counsel for Gulf & Western wrote and objected to the Commission's discussions with Dolkart, the Commission fully considered the possibility of a breach and concluded that there had not been one. In its reply, the SEC indicated a willingness to receive and consider "any specific information bearing on the issues raised in [the inquiry], or any other matter relevant to this investigation...."[12] There was no re-sponse to this invitation. Further, it noted that when the Commission considered the question of whether Dolkart was breaching the privilege, the staff members immediately involved in the investigation were in attendance and were aware of the Commission's concerns.

Defendants make much of Dolkart's testimony that he never had a conversation with the SEC staff regarding the privilege nor did he ever refuse to answer a question because it called for such information. The argument is overdrawn even when the context of Dolkart's statement is considered alone. Beyond that, however, they ignore or discount his testimony that he held back numerous matters because of the privilege and had several meetings with his attorney, where they ruled out a number of subjects before his discussions with SEC staff members.

The fact that Dolkart's interviews and discussions were not transcribed is also over-emphasized. A staff member, Alan Siflinger, did testify that this was a departure. But he also noted that the practice was not inviolate and that there were exceptions. Indeed, during the investigation, he personally conducted informal interviews, where testimony of several witnesses was not recorded. Other staff members also obtained significant information from witnesses through informal interviews rather than by recorded, memorialized testimony. Theodore Levine identified in his affidavit several persons who supplied information in this manner.[13]

### B. Leaks to the Press

▪ In the November 24th opinion, the Court noted that "the affirmative defense

---

11. At the June 8th hearing, defendants asserted that all of the allegations in the amended complaint "had their genesis in Mr. Dolkart's revelations", June 8, 1981 Transcript at 52. As proof, counsel proffered a list of issues including references to staff members' deposition testimony. After examination, the Court is convinced defendants have not proved this allegation. The staff members merely admitted generally discussing some of the issues involved with Dolkart. No evidence was presented to support defendants' inference that all the Commission's information came from Dolkart. The Court rejects the argument that the burden is on the Commission to show an independent lead.

12. Defs.Ex. 14.

13. Affidavit of Theodore A. Levine, Associate Director of the Division of Enforcement, SEC, filed June 17, 1981.

based on leaks to the press appear[ed] to be of questionable merit." 502 F.Supp. at 347, n.7. After a review of the record and counsel's oral argument, the Court is reassured of its initial assessment. Defendants have failed to show that the information in the *New York Times* articles was leaked by Commission staff members. Because they failed to meet this initial burden, there is no need to address an earlier posed question, namely, whether the leaks caused "substantial and irreparable harm" and were a form of summary punishment amounting to a denial of due process.

There is scant evidence in the record to substantiate the defendants' allegations that the Commission was responsible. Staff members denied under oath that they leaked information to the press. Sporkin did have an extensive meeting at his home with the reporter Seymour Hersh. He claims, however, that he refused to review the articles; and that he was unfamiliar with many of the facts regarding the investigation. While he might have exercised better judgment under the circumstances, the defendants had a full opportunity to depose him.

At most, the defendants have succeeded in showing that staff members had conversations and meetings with the reporters.[14] The Court certainly cannot condone the several contacts, especially during the course of a private and sensitive investigation. But at the same time, there is no direct evidence that the staff was the source of the reporters' leads. Indeed, the record shows that the reporters attributed much of the information to Gulf & Western officers. It also reflects that Hersh told Dolkart that he was "into" Gulf & Western and Simpson Thacher. Defendants have not denied this. The articles reported that Hersh and Gerth spoke with more than 75 former Gulf & Western officers and employees, some of whom were actually named.[15] On June 28, 1977, before publication of the articles, Richard Sharp, a SEC staff member, was told by one of the reporters how the *Times* obtained its information. He made the following notes after a conversation with Gerth:

> The articles attribute certain statements and information to 'reliable government sources'. I asked him to whom he was referring since he knew that the SEC staff had provided him with no non-public information. He agreed that the staff had given him no such information and explained that the reference included other federal agencies or offices and the D.A.'s Office in New York.[16]

The *New York Times* articles stated that at the time they were written, the New York District Attorney's Office, the Internal Revenue Service and the United States Department of Justice were also investigating Gulf & Western, thus providing other possible sources of information.

The defendants also argue that the information in the articles directly tracked the information contained in Dolkart's affidavit. Their argument continues, that since the Commission had the only copy of his affidavit, staff members must have given it to the reporters. The Commission refuted that argument at the recent hearing by noting that the:

> document was in the possession of Dolkart—in the possession of the Court and the officers of the Court, in the possession of the Manhattan District Attorney's Office and anybody there who might have access to it and [why] would the SEC be the one that is presumed, because it certainly wasn't proved—presumed to have given the affidavit to the reporters.[17]

---

**14.** In their moving papers and at the oral argument, defendants' counsel alluded to the possibility of taking the depositions of the two *Times* reporters. The defendants have done no more than state a possibility. Such a request would, of course, give rise to serious legal issues.

**15.** Defs.Ex. 29.

**16.** Defs.Ex. 91 at 2.

**17.** June 8, 1981 Transcript at 88.

The Commission is a public agency and its staff may speak with the press. There are strict limits, however, as to what may be disclosed, that is, only public, as opposed to nonpublic information should be communicated to the press or the public. There is no showing that this was not observed in a responsible manner.

## CONCLUSION

The defendants express a concern that if Dolkart's cooperation with the SEC is sanctioned, attorneys would be tempted to reveal their clients' confidences whenever they encountered trouble. This ruling should not be read to endorse such a practice. The propriety of Dolkart's plea agreement is not an issue here. This Court is only concerned with the Commission's behavior during the Gulf & Western investigation and whether any improprieties occurred. None has been found. Permitting this matter to proceed should not erode the policies underlying the privilege or place a chilling effect on future attorney-client relationships.

█ The Commission's mission is to protect the public interest and the interests of the shareholders. The attorney-client privilege should be subject to the need to obtain the truth of the allegations in the Commission's complaint. The agency's need to know is not all-exclusive, nor is the privilege all-absolute. A court should weigh the conflicting needs and conditions presented to determine whether, under the prevailing circumstances, the privilege should be allowed to stand.

In this case, the Commission, as protector of the public interest, could possibly show good cause to justify disclosure of any privileged information obtained from Dolkart. The Court does not reach this issue, however, since the defendants have failed to show a breach of the attorney-client relationship.

At the initial hearing on the Commission's motion to strike the affirmative defenses, counsel stated that with limited discovery a full record could be developed to prove the serious allegations against the Commission.[18] Now, after extended discovery and more than 200 exhibits and over 4000 pages of testimony have been generated, the defendants have not shouldered their burden. They now request an evidentiary hearing and attempt to shift the burden of proof to the Commission. The Court is forced to infer that the defendants are unable to produce a record because no specific breaches do in fact exist. The Commission's staff has been forthcoming with testimony and documents and the Court finds that there was no calculated conduct to violate the rights of the several defendants. There is no showing of any attempt to muddle the record or sweep matters under the rug. The attempt to shift the burden of proof to the Commission is unacceptable. The defendants have had access to all the witness testimony and documents that could possibly surface at an evidentiary hearing. To accept their proposal would only delay the consideration of the merits of this litigation.

The Court is satisfied that the Commission did not solicit confidential information from Joel Dolkart. Nor has it been shown that he breached the attorney-client privilege. The defendants have not shown that information was leaked to the press by SEC staff members. There is no reason to allow the affirmative defense to remain. The defendants have had ample opportunity and have not shown such a defense is meritorious.[19]

---

**18.** November 10, 1980 Transcript at 39–40.

**19.** On May 13, 1981, the Court denied defendants' motion to compel production of documents on the theory that they were protected by the governmental privilege. The Court postponed ruling on three documents (Nos. 2.4, 3.5 and 6a.3) relating to the affirmative defense. Because of this ruling, the defendants have no need for access to these documents and the Court need not reach the question of whether they are privileged.